**THE INSTITUTE FOR JUSTICE**
Joseph Gay*
jgay@ij.org
Robert Frommer*
rfrommer@ij.org
901 N. Glebe Rd. Suite 900
Arlington, VA 22203
Tel. (703) 682-9320

Robert E. Johnson*
rjohnson@ij.org
16781 Chagrin Blvd. Suite 256
Shaker Heights, OH 44120
Tel. (703) 682-9320

* Applications for admission *pro hac vice* forthcoming

**THE VORA LAW FIRM, P.C.**
Lou Egerton-Wiley (SBN 323482)
lou@voralaw.com
Nilay U. Vora (SBN 268339)
nvora@voralaw.com
Jeffrey Atteberry (SBN 266728)
jatteberry@voralaw.com
201 Santa Monica Blvd., Ste. 300
Santa Monica, California 90401
Tel. (424) 258-5190

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| **JENI PEARSONS and MICHAEL STORC,** | Case No. _____ |
| Plaintiffs, | |
| **v.** | |
| | **COMPLAINT** |
| **UNITED STATES OF AMERICA; Federal Bureau of Investigation Special Agent LYNNE ZELLHART, in her individual capacity; and DOES 1 through 5, Federal Bureau of Investigation agents in their individual capacities,** | |
| Defendants. | |

**INTRODUCTION**

1.     When the government takes someone's personal property, it should be responsible for keeping it safe. Yet all too often, government officials take people's property—to forfeit, to use as evidence, or simply because they can—and when the government's asserted need for the property ends, the government fails to return the property, in whole or in part.

2.     That's what happened to Plaintiffs Jeni Pearsons and Michael Storc. The government broke into Jeni and Michael's safe-deposit box at U.S. Private Vaults (USPV) in Beverly Hills, California, which they used to store $2,000 in cash and about $20,000 in silver they had purchased as a retirement nest egg. Without any evidence that Jeni and Michael had done anything wrong, the government tried to administratively forfeit the silver. The government eventually abandoned its unjustified forfeiture attempt and tried to return the property. But by that time, the $2,000 in cash in Jeni and Michael's box had disappeared.

3.     Jeni and Michael's problems began on March 22, 2021, when the FBI raided USPV's business premises based on suspicion that the business itself had committed various crimes. The FBI's warrant application stated that by seizing USPV's property, the FBI would end up with custody of the individual safe-deposit boxes, too. And to address the obvious constitutional concerns that presented, the FBI promised the magistrate judge in its warrant application that the FBI would "preserve the property for safekeeping" and return the property to the rightful owners.

4.     But the FBI also had a separate plan—concealed from the magistrate judge who approved the warrant—to administratively forfeit all boxes containing property worth at least $5,000 (the FBI's minimum threshold for profitability), and to conduct investigatory searches of the boxes for evidence to support the forfeitures. These investigatory searches demanded significant time and effort—for instance, running all cash by drug-sniffing dogs and documenting agents' notes and

observations to use in later forfeiture proceedings. The resulting time crunch left agents scrambling to search each box as quickly as possible so they could move on to the next one.

5.     This left little time for complying with the government's promises to safeguard the boxes and return the contents to the owners. The point of opening the boxes was to create "inventories" of the contents that would protect them against loss or theft. But in the dash to process each box as quickly as possible, the agents often didn't even take the time to carefully check for and protect all the valuable property in the box, once they confirmed that the contents were worth more than $5,000 and therefore subject to forfeiture. And the resulting "inventories" they created were all but useless, describing property worth anywhere from a few dollars to a million dollars with vague terms like "miscellaneous coins." In the rush to finish, it was inevitable that valuable property would go missing, never to be returned to the rightful owners.

6.     After the FBI abandoned its efforts to forfeit Jeni and Michael's property, it returned their silver. But it never returned the $2,000 in cash it took from their box. Jeni and Michael therefore filed an administrative claim with the FBI, showing that they had placed $2,000 in their box shortly before the USPV raid and that the FBI had not returned the $2,000. Adding insult to injury, however, the FBI denied any responsibility, disingenuously stating that there was "no evidence of negligence or wrongful acts on the part of any FBI employee."

7.     That's wrong. Jeni and Michael's cash was completely secure until FBI agents broke open the safe-deposit box looking for property that could be forfeited. Its disappearance can only be explained by the acts or omissions of the FBI agents who broke into the box and rummaged through it. The FBI never should have broken into the safe-deposit boxes in the first place but, once it did, it became responsible for returning everything it had custody of, unless it had a lawful reason to keep it.

8.      Jeni and Michael are entitled to have their cash returned, or to be reimbursed for its loss, regardless of whether they can prove that some FBI employee did something wrong or was negligent. Whatever the reason for the cash disappearing, the government is responsible for either returning the cash to Jeni and Michael or compensating them for what it took.

9.      This lawsuit therefore seeks to hold the government to its word. The government promised that it would safeguard and return the property it took from the USPV safe-deposit boxes. It should be accountable for taking Jeni and Michael's property and not giving it back.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1346(a)(2), 1346(b)(1), 1367, 2201, and 2202.

11.      Venue is proper in the United States District Court for the Central District of California under 28 U.S.C. §§ 1402(b) and 1391(e)(1).

## PARTIES

12.      Plaintiffs Jeni Pearsons and Michael Storc are a married couple and adult residents of Los Angeles County, California. Jeni is the Director of Operations for a nonprofit theater and Michael works in the film industry as a transportation coordinator. At USPV's Beverly Hills facility, they rented a safe deposit box in which they placed silver and about $2,000 in cash, as well as various personal documents.

13.      Defendant United States of America (the "United States" or the "government") is the national federal government established by the U.S. Constitution. It is liable for its express and implied contracts under the Tucker Act and Little Tucker Act, 28 U.S.C. §§ 1346(a)(2) and 1491(a)(1), for the acts of its officials under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671–80, and for taking property without just compensation under the Fifth Amendment's Takings

Clause, the Tucker Act, and the Little Tucker Act. References to conduct by the United States include acts taken by its agents and employees.

14.     Defendant Lynne Zellhart is a special agent with the Federal Bureau of Investigation who is responsible for the acts, violations, and injuries alleged in this action. She spearheaded the government's secret plan to break into the USPV safe-deposit boxes. Among other conduct, she made representations to the magistrate judge and to boxholders about safeguarding the property so it could be returned to the rightful owners; led the development of the secret plan to seize and forfeit boxes containing property worth more than $5,000 and to conduct investigatory searches for evidence to support the forfeitures; created specialized procedures to conduct the investigatory searches of the boxes at the expense of safeguarding their contents; and directly supervised the process of breaking into the USPV boxes, conducting investigatory searches of the contents, seizing the contents for forfeiture, and eventually returning (or failing to return) the contents to the boxholders.

15.     Defendants Does 1–5 (the "Doe Defendants") are agents of the Federal Bureau of Investigation who, along with Defendant Zellhart, are responsible for the acts, violations, and injuries alleged in this action. Among other conduct, they searched or assisted in the search of Plaintiffs' USPV safe-deposit box and, in that role, were entrusted with safeguarding the contents, including the $2,000 in cash stored in the box, so that it could be safely returned to Plaintiffs. Their identities and their number are currently unknown to Plaintiffs but can be determined by the government based on its internal records. They will be added as named Defendants when their identities are disclosed. They are sued in their individual capacities under the Constitution, *Bivens*, the Westfall Act (28 U.S.C. § 2679(b)(2)(A)), and California statutory and common law. The acts, violations, and injuries for which they are responsible in this action also form the basis for liability of the United States of America under the Federal Tort Claims Act.

1    16.    The Doe Defendants, together with Defendant Zellhart, are referred to

2    collectively as the "Individual Defendants."

3                        **FACTUAL ALLEGATIONS**

4    **Jeni and Michael Deposited Their Personal Property With USPV**

5    17.    USPV is a corporation that operated a safe-deposit-box facility at 9182

6    West Olympic Blvd., Beverly Hills, California.

7    18.    USPV's Beverly Hills facility housed about 1,400 safe-deposit boxes

8    in its vault.

9    19.    USPV safe-deposit-box service provided renters with several

10   advantages over traditional banks. It had better hours of operation than most banks,

11   and customers could access the outer vault themselves using biometric data (like an

12   iris scan) rather than having to wait for a USPV employee to assist them.

13   20.    USPV also provided enhanced security and privacy. For example, all

14   the keys for USPV's safe deposit boxes are left in customers' hands, so USPV and

15   its employees cannot access its customers' safe-deposit boxes without their

16   knowledge.

17   21.    On or about September 9, 2017, Jeni and Michael rented safe-deposit

18   box number 4301 at USPV.

19   22.    This created a relationship between Jeni and Michael as bailor, on the

20   one hand, and USPV as the bailee, on the other hand. As bailee, USPV had duties

21   under California law to safeguard Jeni and Michael's property and was liable for

22   the failure to return their property when required to do so.

23   23.    Additionally, as part of the contract between USPV, on one hand, and

24   Jeni and Michael, on the other, USPV agreed to provide complete and total security

25   for the contents of Jeni and Michael's safe-deposit box and to be liable for loss of,

26   theft of, or unauthorized access to the contents of the box.

27   24.    Jeni and Michael chose to rent a safe-deposit box at USPV because

28   they were looking for a safe place to keep valuable property. Their residence did

not have room to install a safe, and they thought it would be better and safer to keep their property in a secure facility outside of their home. They also liked that USPV was close to their home.

25.   Jeni and Michael trusted and expected USPV to safeguard their property. They had every impression that USPV was a trustworthy, legitimate business.

26.   Jeni and Michael used their box to store silver that they purchased as a retirement nest egg, extra cash, and copies of personal documents.

27.   They acquired the cash and silver over several years, using Jeni's income working at a non-profit theater company and Michael's income as a transportation coordinator in the film industry.

28.   Consistent with USPV's recommendation, Jeni and Michael also placed a letter containing their contact information, as well as information identifying their beneficiaries, on top of the interior sleeve of their box. The remaining contents of their box were contained within that interior sleeve.

29.   Jeni and Michael renewed their safe-deposit-box lease with USPV in November 2020.

30.   When they visited their safe-deposit box at USPV, Jeni and Michael would also occasionally photograph the contents of their box.

31.   The following photograph from February 2, 2021, accurately depicts the portion of Jeni and Michael's USPV box where they were storing their cash at the bottom of a small, black cardboard box inside of their box, before the government raided USPV:



32.    As of March 22, 2021, Jeni and Michael's USPV safe-deposit box contained $2,000 in cash, about $20,000 worth of silver, and personal documents, such as receipts for the silver purchases.

**The Government And Defendant Zellhart Obtain A Warrant To Seize USPV's Nest Of Safe-Deposit Boxes By Promising To Safeguard The Contents**

33.    On March 9, 2021, the United States indicted USPV, the company, for money laundering and drug trafficking.

34.    On March 17, 2021, the government applied to a magistrate judge for a warrant to search USPV's business premises and to seize certain business property owned by USPV. Defendant Zellhart had been in charge of drafting the affidavit for the warrant application and ultimately swore under oath that it was true.

35.    In the application, Defendant Zellhart made representations under oath to the magistrate judge about how the government would conduct the search.

36.     One item the warrant application requested permission to seize was the "nests of safety deposit boxes," that is, the relatively worthless structure that houses all the individual safe-deposit boxes.

37.     The application explained that the government sought to seize "the nests of boxes themselves, <u>not</u> their contents." But by seizing the nests, the government would "end up with custody of what is inside those boxes."

38.     To alleviate the obvious concerns arising from the government taking the property of so many innocent third parties, the warrant application promised to safeguard the contents of the safe-deposit boxes so that they could be returned to their rightful owners.

39.     The warrant application assured the magistrate judge that agents would follow their written inventory policies to "protect their agencies from claims of theft or damage to the contents of the boxes."

40.     The warrant application also represented that agents would seek to "identify the owner and preserve the property for safekeeping."

41.     Relying on these statements that the government would safeguard the contents of the boxes and reunite them with the rightful owners, the magistrate judge issued the warrant to search USPV's business premises and to seize the nest of safe-deposit boxes.

42.     The warrant, however, specifically did not authorize a "criminal search or seizure of the contents of the safety deposit boxes."

43.     Instead, the warrant instructed agents to conduct an "inventory" of the boxes "to protect their agencies and the contents of the boxes."

44.     The warrant also directed agents to inspect the boxes in order to identify ownership, so that the property could be safely returned to the rightful owners.

**The Government and Defendant Zellhart Separately Plan To Forfeit Everything Over $5,000 And To Search The Boxes For Evidence Of Crimes**

45.     But in contrast to the statements in its warrant application, the government had also formulated a separate plan for the USPV boxes that it did not disclose to the magistrate judge.

46.     Defendant Zellhart testified about this plan during depositions in an earlier lawsuit. According to her testimony as the government's 30(b)(6) representative, the government decided to move forward with indicting USPV and raiding its business in the summer or fall of 2020.

47.     Defendant Zellhart also testified that from the beginning, she and the government planned to seize the nest of safe deposit boxes in the USPV raid. Defendant Zellhart also confirmed that the government did not want the nest for its evidentiary value, but instead to bring USPV's business to a "screeching halt."

48.     Defendant Zellhart also testified that by about this time, she and the government were already planning to use civil forfeiture against some or all the property at USPV.

49.     As part of this planning, the FBI agent in charge of the Los Angeles Field Office criminal division spoke with the head of the asset forfeiture unit for the office in summer 2020. He asked whether the unit could handle the anticipated forfeiture of hundreds of USPV boxholders' property. The forfeiture head confirmed that the office could process that volume.

50.     As planning for the raid progressed, and before applying for the warrant, the forfeiture head of the FBI's Los Angeles Field Office "made a determination that there was probable cause to proceed [with civil forfeiture] on assets seized in the investigation from U.S. Private Vaults," including "the contents of the boxes." That is, even before applying for the warrant, the government "had already determined that there was probable cause to move forward" with forfeiture actions against the box contents. The only factor determining whether the

government tried to forfeit the box contents was whether it "met the minimum monetary threshold" of $5,000, because below that, "the cost [to forfeit] would be more than the value of the asset."

51. To carry out this large-scale forfeiture, Defendant Zellhart created specialized one-time search procedures for the USPV boxes. These procedures were admittedly designed to identify evidence to support the forfeitures. As Agent Zellhart confirmed in her 30(b)(6) deposition, she "wanted agents to gather information concerning, for instance, whether the money smelled like drugs, or if it was banded -- packaged in an unusual manner." The specialized search procedures included, for example, running currency by drug sniffing dogs, documenting agents' "cash observations," and providing copies of all paperwork to the asset forfeiture unit.

**In The Rush To Search For Evidence To Support The Forfeitures, Defendants Fail To Safeguard The Contents Of The Boxes Like They Promised**

52. On March 22, 2021, the government executed its search and seizure warrant at USPV's business premises, seized the "nest" of safe-deposit boxes, and, in so doing, "end[ed] up with custody of what [was] inside those boxes."

53. Having obtained custody of the contents of the boxes, the government assumed the role and accompanying duties of bailee of the contents previously held by USPV.

54. Having obtained custody of the contents of the boxes, the government assumed responsibility for safeguarding the property and returning the contents to the rightful owners, as the government represented it would do in its warrant application.

55. When the government obtained custody of the USPV safe-deposit boxes and the contents of the boxes, the contents were safe and secure because they were in locked boxes that could only be accessed by those boxes' owners using their keys.

56.    Instead of honoring its promises to safeguard the safe-deposit boxes and return the contents to the rightful owners, the government instead spent the week of March 22, 2021, breaking into the safe-deposit boxes to look for property to forfeit and searching for evidence to support the forfeitures (such as running cash by drug-sniffing dogs, describing the condition of cash, and looking inside sealed envelopes).

57.    The resulting search was hectic. Searching nearly 1,400 boxes for evidence to support the forfeitures took days longer than anticipated. This led to time constraints that required Defendants to cut corners in their efforts to safeguard boxholders' property. (They did not, of course, cut corners in their efforts to search for evidence to support the forfeitures.)

58.    For example, one way to safeguard the contents of the boxes was to videotape the process of opening the boxes. But as Defendant Zellhart confirmed in her deposition, "reality got in the way," and Defendants did not videotape about half of the boxes they opened.

59.    Another way to safeguard the contents of the boxes would have been to create meaningful inventories describing the valuable property taken from the boxes. But in the chaos following the raid and the rush to search for evidence to support their forfeiture plans, Defendants failed to create meaningful inventories. As one agent involved in the searches testified in an earlier deposition, the agents were trying to be "speedy" with each box so they could "move on to the next one." And as the searches dragged on, adjoining businesses became frustrated by the government's lingering presence, further pressuring Defendants to "move as quickly as [they] could," and putting a "premium" on "processing boxes quickly."

60.    This rushed, slapdash process created inventories that were essentially useless for their ostensible purpose of safeguarding the contents of the boxes. Instead, the inventories described the contents in vague, general terms, like "miscellaneous coins" or "assorted jewelry" or "miscellaneous general items."

These descriptions could cover anything from novelty items worth a couple bucks to rare and valuable coins and jewelry worth millions.

61.     Another way of safeguarding the contents of the boxes against theft, damage, or loss would have been to leave the safe-deposit boxes locked. But that would not have accomplished the government's purpose of finding boxes with property that could be forfeited. To achieve that purpose, the government broke into the boxes and deliberately exposed those contents to theft, damage, and loss.

62.     The foreseeable and probable result of breaking open the boxes was that valuable property would be stolen, damaged, misplaced, or lost. The locked boxes were safe, so opening them inevitably created a risk of loss. And trying to process so many boxes in such a short period of time would inevitably lead to some property going missing, even in the best of circumstances. And these were not the best of circumstances, with agents searching for evidence to support the forfeitures at the expense of being careful to safeguard the property.

63.     Valuable property stored in the USPV safe-deposit boxes was in fact stolen, damaged, misplaced, or lost after the government broke into them.

64.     For example, one safe-deposit box held the retirement savings of an 80-year-old, semi-retired doctor, who later filed suit under the name Dr. Linda R. The agents searching her box created a written inventory that listed "misc. coins" and a video inventory that only vaguely depicted envelopes containing coins, without quantifying the number, type, or value of coins they contained. Dr. R. filed a lawsuit and a motion for the return of her property under Federal Rule of Criminal Procedure 41(g) after discovering the government had lost dozens of gold coins that were worth more than $75,000. The government successfully moved to dismiss that lawsuit for lack of jurisdiction on the ground that Rule 41(g) does not provide a remedy for lost property.

65.     In another case, the government initially lost 110 gold coins worth about $220,000 belonging to a retired civil servant for the City of Los Angeles, who

also used the box to store his retirement savings. After he filed a lawsuit over the missing coins, the government "found" 47 of the coins. But the remaining 63 gold coins worth about $123,000 were never returned. The plaintiff in that case dismissed his case after the government moved to dismiss for lack of jurisdiction under Rule 41(g). (He is now represented by the same counsel as Jeni and Michael and is filing a lawsuit at the same time as this one challenging the government's loss of his gold coins.)

### **Defendants Take Jeni And Michael's Property**

66.     As with the other USPV safe-deposit boxes, the government also took custody of Jeni and Michael's box on or about March 22, 2021.

67.     Sometime during the week of March 22, 2021, the Doe Defendants broke into Jeni and Michael's box.

68.     According to the government's representations to the magistrate judge and restrictions contained in the warrant, the Doe Defendants broke into Jeni and Michael's box to safeguard the property in the government's custody until it could be safely returned to Jeni and Michael.

69.     Consistent with those representations, the Doe Defendants had a duty to safeguard the contents of Jeni and Michael's box so that the property could be returned to Jeni and Michael.

70.     But instead of safeguarding Jeni and Michael's property, the Doe Defendants broke into Jeni and Michael's box to look for property to forfeit, and to search for evidence to support the forfeiture.

71.     When the Doe Defendants estimated that the contents of Jeni and Michael's box were worth more than $5,000, they seized those contents for the purpose of subjecting them to administrative forfeiture.

72.     The Doe Defendants also prepared the inventory forms for Jeni and Michael's box.

73. On information and belief, those forms do not refer to the $2,000 in cash stored in Jeni and Michael's box.

74. Jeni and Michael first learned about the FBI's USPV raid in April 2021, when Jeni went to visit their USPV box. When Jeni arrived, she discovered that USPV was shuttered, with a notice from the FBI posted on the door.

75. The FBI notice posted at USPV directed boxholders to go to a "uspvclaims" webpage on the FBI website "to initiate a claim for your US Private Vaults box." The link directed users to a "U.S. Private Vaults Claim Form," which instructed users to provide certain information "[t]o make a claim for property stored at U.S. Private Vaults in Beverly Hills, California."

76. Jeni submitted a claim to the FBI on April 19, 2021. She then received an email from the FBI explaining that "all property seized is in a secure FBI facility. FBI agents and staff are working diligently, in a methodical and systematic way, to process all claims and address each safe deposit box that is in our custody." The email further stated that "it is important to us that we ensure property is returned to the lawful owner," and that the FBI would either "make arrangements to return your property" or "request additional information."

**After Attempting To Forfeit Their Property, The**
**Government Returns Jeni And Michael's Silver, But Not Their $2,000**

77. As the government had planned to do before the raid, it "initiated civil administrative forfeiture against all of the boxes that met the minimum monetary threshold." The property in Jeni and Michael's box was worth more than $5,000, so the government initiated administrative forfeiture proceedings against their box, despite no evidence that the property was properly subject to forfeiture.

78. In May 2021, Jeni and Michael each received a "Notice of Seizure of Property and Initiation of Administrative Forfeiture Proceedings." The notices were dated May 21, 2021, and stated that the government was initiating administrative forfeiture proceedings with respect to the silver the government had taken from Jeni

and Michael's safe-deposit box. The notice did not refer to the cash that Jeni and Michael stored in their box. (Jeni and Michael are plaintiffs in a separate lawsuit that successfully challenged the administrative forfeiture notices on due process grounds, and that, on behalf of a certified class, continues to litigate whether the searches of the USPV boxes violated the Fourth Amendment.)

79.    On May 20, 2021, the government also issued an omnibus notice of seizure directed to USPV. The omnibus notice stated that the government was initiating administrative forfeiture proceedings with respect to the contents of several hundred USPV safe-deposit boxes, including the silver that Jeni and Michael stored in their box. The omnibus notice did not reflect the cash that Jeni and Michael stored in their box.

80.    On August 16, 2021, the government stated that it was abandoning its efforts to forfeit Jeni and Michael's property and that it would instead return the property it had taken from their USPV safe-deposit box.

81.    On October 1, 2021, the government returned Jeni and Michael's silver. To the best of their recollection, Jeni and Michael believe that the FBI returned all their silver. But the FBI never gave them a detailed inventory of the silver it took from their box, so they cannot be certain.

82.    The government did not return their $2,000 in cash, and still has not returned it.

83.    On March 9, 2023, Jeni and Michael submitted administrative claims to the FBI under the FTCA, seeking compensation for the $2,000 that the government never returned.

84.    On March 27, 2023, the FBI denied their claim, asserting that there was "no evidence of negligence or wrongful acts on the part of any FBI employee."

85.    But Jeni and Michael's cash was safe and secure in their safe-deposit box on March 22, 2021. It was only when the FBI took custody of their box and then broke into it that the cash went missing. Whatever happened to it, the only

1   explanation is that it was lost due to either negligence or a wrongful act by an FBI
2   employee.

3       86.     Additionally, regardless of whether any specific FBI employee did
4   something wrong or was negligent, once the government took custody of Jeni and
5   Michael's property, it was responsible for either returning the cash to them or
6   compensating them for what it took.

7                           **INJURY TO PLAINTIFFS**

8       87.     If the government had never taken custody of Jeni and Michael's safe-
9   deposit box at USPV, Jeni and Michael would still have access to their box and to
10  the $2,000 they stored in their box.

11      88.     The government's failure to abide by the representations in its warrant
12  application, the restrictions the judge imposed in the warrant, and its representations
13  to boxholders in its claims materials resulted in the loss of the $2,000 that Jeni and
14  Michael stored in their USPV box.

15      89.     The government's failure to fulfill its duty to safeguard the contents of
16  Jeni and Michael's box, to exercise reasonable care to ensure the contents were not
17  lost, stolen, or misplaced, and ultimately to return the contents to the rightful
18  owners, resulted in Jeni and Michael's loss of the $2,000 in cash they had stored in
19  their USPV box.

20      90.     The government's abdication of its responsibilities to safeguard the
21  contents of Jeni and Michael's box to instead pursue profitable forfeitures resulted
22  in the loss of the $2,000 that Jeni and Michael had stored in their USPV box.

23      91.     The government's conduct of deliberately taking Jeni and Michael's
24  property to further its law enforcement objectives relating to USPV (bringing it to a
25  "screeching halt" and finding forfeitable property), and then permanently depriving
26  Jeni and Michael of the use and possession of the cash in their box, has injured
27  them in the amount of $2,000.

28

92.     Because the $2,000 in cash they had stored in their box was never returned to them, Jeni and Michael can no longer use it as a source of retirement savings, a rainy-day fund, or as a source of cash in case of emergencies.

93.     To redress these injuries, Jeni and Michael therefore assert the following various theories of liability, all of which seek the same relief: $2,000 in damages for the cash that Defendants took custody of but never returned.

## CLAIMS FOR RELIEF

### COUNT I: Conversion and Trespass to Chattels

### Against Defendant United States of America

### Under the Federal Tort Claims Act (28 U.S.C. §§ 1346(b)(1), 2671–80)

94.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in ¶¶ 1 through 93 above.

95.     Under the Federal Tort Claims Act (FTCA), Defendant United States of America is liable for injury or loss of property caused by the negligent or wrongful acts or omissions of its employees acting within the scope of their office or employment.

96.     Defendant United States of America is liable for the tortious acts and injuries caused by the Individual Defendants and other agents working on its behalf because they committed those tortious acts and caused those injuries while acting on behalf of the FBI.

97.     Jeni and Michael timely and properly exhausted the FTCA's administrative claims process.

98.     Jeni and Michael together owned and had the right to possess the $2,000 they stored in their USPV safe-deposit box.

99.     The Individual Defendants, while acting on behalf of the FBI, exercised dominion over the contents of Jeni and Michael's USPV safe-deposit box when they took custody of the box and searched it on or about the week of March

22, 2021, and in doing so, the Individual Defendants engaged in a wrongful act or otherwise disposed of Jeni and Michael's property rights in the cash.

100.    Defendant Zellhart engaged in a wrongful act that interfered with Jeni and Michael's property rights when she instructed the Doe Defendants to break into Jeni and Michael's box, seize the contents for forfeiture, and search for evidence to support the forfeiture.

101.    The Doe Defendants engaged in a wrongful act that interfered with Jeni and Michael's property rights when they broke into Jeni and Michael's box, seized the contents for forfeiture, and searched for evidence to support the forfeiture.

102.    The Doe Defendants engaged in a wrongful act that interfered with Jeni and Michael's property rights to the extent they stole Jeni and Michael's cash or allowed it to be stolen by others. In the absence of any explanation for the missing cash, its disappearance can only be explained by the wrongful acts of the Doe Defendants.

103.    Even assuming they acquired initial possession of the money lawfully, Defendants also wrongfully interfered with Jeni and Michael's property rights when Defendants refused to return the money upon request.

104.    As a result of Defendants' unwarranted interference with Jeni and Michael's property and possessory rights, Jeni and Michael have incurred damages in the amount of $2,000.

105.    The United States is therefore liable under the FTCA for the torts of conversion and trespass to chattels.

**COUNT II: Breach of Bailment**

**Against Defendant United States of America**

**Under the Federal Tort Claims Act (28 U.S.C. §§ 1346(b)(1), 2671–80)**

106.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in ¶¶ 1 through 93 above.

107.   Under the FTCA, Defendant United States of America is liable for injury or loss of property caused by the negligent or wrongful acts or omissions of its employees acting within the scope of their office or employment.

108.   Defendant United States of America is liable for the tortious acts and injuries caused by the Doe Defendants and other agents working on its behalf because they committed those tortious acts and caused those injuries while acting on behalf of the FBI.

109.   Jeni and Michael timely and properly exhausted the FTCA's administrative claims process.

110.   USPV held the contents of the safe-deposit boxes as bailee, and Defendants took on the obligations of a bailee when they transferred custody of the contents of Jeni and Michael's box from USPV to themselves.

111.   The contents of the USPV safe-deposit boxes were delivered into the custody of Defendants for the purpose of safeguarding the contents until they could be returned to the rightful owners.

112.   Defendants made statements, both to the magistrate judge and directly to boxholders, that they were taking delivery of the contents of the USPV boxes for the purpose of caring for the property until the rightful owners could request redelivery.

113.   The contents of the USPV safe-deposit boxes were also delivered into Defendants' custody to benefit Defendants by helping them to shut down USPV's business and search for property that could be forfeited.

114.   As bailees, Defendants received delivery of the contents of Jeni and Michael's box, including the $2,000.

115.   Jeni and Michael have demanded the return of their property, including their $2,000.

116.   Defendants failed to return all the property, specifically the $2,000, when Jeni and Michael demanded redelivery.

117.   Defendants have not offered any justification for their failure to re-deliver Jeni and Michael's property, nor is there any possible explanation other than the wrongful or negligent acts of Defendants.

118.   Defendant United States of America is therefore liable for breaching its bailment obligations in the amount of $2,000.

## COUNT III: Negligence
### Against Defendant United States of America
### Under the Federal Tort Claims Act (28 U.S.C. §§ 1346(b)(1), 2671–80)

119.   Plaintiffs re-allege and incorporate by reference each and every allegation set forth in ¶¶ 1 through 93 above.

120.   Under the FTCA, Defendant United States of America is liable for injury or loss of property caused by the negligent or wrongful acts or omissions of its employees acting within the scope of their office or employment.

121.   Defendant United States of America is liable for the tortious acts and injuries caused by the Doe Defendants and other agents working on its behalf because they committed those tortious acts and caused those injuries while acting on behalf of the FBI.

122.   Jeni and Michael timely and properly exhausted the FTCA's administrative claims process.

123.   Defendants had a duty, pursuant to the representations in the warrant application, the limitations in the warrant, their representations to boxholders, and from their own conduct in taking custody of the boxes, to safeguard the contents of the boxes in their custody, to ensure that those contents were not lost, stolen, or destroyed, and ultimately to return the contents of the USPV boxes to their rightful owners.

124.   Defendants breached this duty when they lost or stole Jeni and Michael's $2,000 in cash.

125.   The government and Defendant Zellhart breached this duty when they failed to take reasonable care to prevent Jeni and Michael's cash from being lost or stolen. They instructed the agents searching the boxes to search for evidence to support the forfeitures instead of safeguarding the contents of the boxes, created instructions for searching the boxes that were calculated to uncover evidence to support the forfeitures at the expense of safeguarding the contents, and directly created the frenzied environment that required agents to search the boxes as quickly as possible.

126.   The Doe Defendants also breached this duty when they failed to take reasonable care to prevent Jeni and Michael's cash from being lost or stolen. They failed to take the time to secure the contents against theft or loss, instead processing the box as quickly as they could so they could move on to the next one. The Doe Defendants also failed to create a meaningful inventory of the valuable property inside Jeni and Michael's box. Finally, under the circumstances, the disappearance of the cash can only be explained by the Doe Defendants' failure to take reasonable care to guard the contents of Jeni and Michael's box.

127.   Jeni and Michael's cash was secure in their box before Defendants broke into it. In the absence of any explanation or evidence from the government about how the cash disappeared, the only explanation under the circumstances is that Defendants were negligent or worse.

128.   As a proximate result of Defendants' breach of that duty, Jeni and Michael have been damaged in the amount of $2,000.

129.   The United States is therefore liable under the FTCA for the tort of negligence.

**COUNT IV: Breach Of Bailment Contract**

**Against Defendant United States of America**

**Under the Little Tucker Act (28 U.S.C. § 1346(a)(2))**

130.   Plaintiffs re-allege and incorporate by reference each and every allegation set forth in ¶¶ 1 through 93 above.

131.   Under the Little Tucker Act, the United States is liable for breaches of express or implied contracts, and the district courts have jurisdiction over such claims so long as they do not exceed $10,000.

132.   USPV held the contents of the safe-deposit boxes as bailee, and Defendants took on the obligations of a bailee when they transferred custody of the contents of Jeni and Michael's box from USPV to themselves.

133.   The contents of the USPV safe-deposit boxes were delivered into the custody of Defendants for the purpose of safeguarding the contents until they could be returned to the rightful owners.

134.   Defendants made statements, both to the magistrate judge and directly to boxholders, that they were taking delivery of the contents of the USPV boxes for the purpose of caring for the property until the rightful owners could request redelivery.

135.   The contents of the USPV safe-deposit boxes were also delivered into Defendants' custody to benefit Defendants by helping them to shut down USPV's business and search for property that could be forfeited.

136.   As bailees, Defendants received delivery of the contents of Jeni and Michael's box, including the $2,000.

137.   Jeni and Michael have demanded the return of their property, including their $2,000.

138.   Defendants failed to return all the property, specifically the $2,000, when Jeni and Michael demanded redelivery.

139.   Defendants have not offered any justification for their failure to re-deliver Jeni and Michael's property.

140.   Defendant United States of America is therefore liable for breaching its bailment obligations in the amount of $2,000.

**COUNT V: Unconstitutional Taking Without Just Compensation**

**Against Defendant United States of America**

**Under the Little Tucker Act (28 U.S.C. § 1346(a)(2)) and the Fifth Amendment**

141.   Plaintiffs re-allege and incorporate by reference each and every allegation set forth in ¶¶ 1 through 93 above.

142.   The Takings Clause of the Fifth Amendment to the U.S. Constitution states, "nor shall private property be taken for public use, without just compensation."

143.   The Little Tucker Act provides district courts with jurisdiction over claims "founded … upon the Constitution," such as claims under the Fifth Amendment, that do not exceed $10,000.

144.   Jeni and Michael possessed protectable property interests in the $2,000 in cash they stored in their USPV box. They were the sole owners of the cash, and they shared the sole right to access, possess, use, and dispose of the cash.

145.   Defendants intentionally invaded that property interest. Even if it was not wrongful to do so and benefited the public, they purposefully took Jeni and Michael's property in connection with their efforts to shut down USPV's business operations and search for forfeitable property. Defendants' refusal to return the property, whatever their reason for not returning it, has permanently divested Jeni and Michael of the entirety of their property rights in the $2,000 in cash.

146.   Even if it was not wrongful to do so and benefited the public, the direct, natural, or probable result of breaking into hundreds of safe-deposit boxes at USPV is that some of that property would be lost, stolen, or misplaced. Defendants decided to do so anyways because they judged that the government objectives they

were pursuing (shutting down USPV and discovering property that could be forfeited) were worth those losses. And as a direct result of that decision, Jeni and Michael have lost all ability to possess and use their $2,000.

147.   Even if it was not wrongful to do so and benefited the public, the direct, natural, or probable result of sacrificing the creation of meaningful inventories to instead search for forfeitable property and evidence to support forfeitures, is that some of that property would be lost, stolen, or misplaced. Defendants decided to do so anyways because they judged that the government objectives they were pursuing (shutting down USPV and discovering property that could be forfeited) were worth those losses. And as a direct result of that decision, Jeni and Michael have lost all ability to possess and use their $2,000.

**COUNT VI: Conversion and Trespass to Chattels**

**Against Individual Defendants**

**Under California Law**

148.   Plaintiffs re-allege and incorporate by reference each and every allegation set forth in ¶¶ 1 through 93 above.

149.   Jeni and Michael together owned and had the right to possess the $2,000 they stored in their USPV safe-deposit box.

150.   The Individual Defendants exercised dominion over the contents of Jeni and Michael's USPV safe-deposit box when they took custody of the box and searched it on or about the week of March 22, 2021, and in doing so, the Individual Defendants engaged in a wrongful act or otherwise disposed of Jeni and Michael's property rights in the cash.

151.   Defendant Zellhart engaged in a wrongful act that interfered with Jeni and Michael's property rights when she instructed the Doe Defendants to break into Jeni and Michael's box, seize the contents for forfeiture, and search for evidence to support the forfeiture.

152.   The Doe Defendants engaged in a wrongful act that interfered with Jeni and Michael's property rights when they broke into Jeni and Michael's box, seized the contents for forfeiture, and searched for evidence to support the forfeiture.

153.   The Doe Defendants engaged in a wrongful act that interfered with Jeni and Michael's property rights to the extent they stole Jeni and Michael's cash or allowed it to be stolen by others. In the absence of any explanation for the missing cash, its disappearance can only be explained by the wrongful acts of the Doe Defendants.

154.   Even assuming they acquired initial possession of the money lawfully, the Individual Defendants also wrongfully interfered with Jeni and Michael's property rights when they refused to return the money upon request.

155.   As a result of the Individual Defendants' unwarranted interference with Jeni and Michael's property and possessory rights, Jeni and Michael have incurred damages in the amount of $2,000.

156.   The tortious conduct by the Individual Defendants also violated the Constitution, including the Fourth Amendment.

157.   As a result of the tortious and unconstitutional conduct of the Individual Defendants, Jeni and Michael have incurred damages in the amount of $2,000.

158.   Individual Defendants' tortious conduct also violated the Constitution and therefore falls under the Westfall Act exception for claims "brought for a violation of the Constitution of the United States." 28 U.S.C. § 2679(b)(2). To the extent the claim remains barred by 28 U.S.C. § 2679(b)(1) under current precedent, Jeni and Michael preserve the issue.

**COUNT VII: Breach of Bailment**

**Against Individual Defendants**

**Under California Law**

159.   Plaintiffs re-allege and incorporate by reference each and every allegation set forth in ¶¶ 1 through 93 above.

160.   USPV held the contents of the safe-deposit boxes as bailee, and the Individual Defendants took on the obligations of a bailee when they transferred custody of the contents of Jeni and Michael's box from USPV to themselves.

161.   The contents of Jeni and Michael's USPV safe-deposit box were delivered into the custody of the Individual Defendants for the purpose of safeguarding the contents until they could be returned to the rightful owners.

162.   Defendants made statements, both to the magistrate judge and directly to boxholders, indicating that the Individual Defendants were taking delivery of the contents of the USPV boxes for the purpose of caring for the property until the rightful owners could request redelivery.

163.   The contents of the USPV safe-deposit boxes were also delivered into the Individual Defendants' custody to benefit the Individual Defendants by helping them to accomplish their objectives of shutting down USPV's business and searching for property that could be forfeited.

164.   As bailees, the Individual Defendants received delivery of the contents of Jeni and Michael's box, including the $2,000.

165.   Jeni and Michael have demanded the return of their property, including their $2,000.

166.   The Individual Defendants failed to return all the property, specifically the $2,000, when Jeni and Michael demanded redelivery.

167.   The Individual Defendants have not offered any justification for their failure to re-deliver Jeni and Michael's property, nor is there any possible explanation other than the wrongful or negligent acts of the Individual Defendants

168.   The conduct by the Individual Defendants, which was both tortious and breached the bailment contract, also violated the Constitution, including the Fourth Amendment.

169.   As a result of the tortious conduct, breach of contract, and unconstitutional conduct of the Individual Defendants, Jeni and Michael have incurred damages in the amount of $2,000.

170.   Individual Defendants' tortious conduct also violated the Constitution and therefore falls under the Westfall Act exception for claims "brought for a violation of the Constitution of the United States." 28 U.S.C. § 2679(b)(2). To the extent the claim remains barred by 28 U.S.C. § 2679(b)(1) under current precedent, Jeni and Michael preserve the issue.

**COUNT VIII: Negligence**

**Against Individual Defendants**

**Under California Law**

171.   Plaintiffs re-allege and incorporate by reference each and every allegation set forth in ¶¶ 1 through 93 above.

172.   The Individual Defendants had a duty pursuant to the representations in the warrant application, the limitations in the warrant, the representations to boxholders, and from their own conduct in taking custody of the boxes, to safeguard the contents, to ensure the contents were not lost, stolen, or destroyed, and ultimately to return the contents of the USPV boxes to their rightful owners.

173.   The Individual Defendants breached this duty when they lost or stole Jeni and Michael's $2,000 in cash.

174.   Defendant Zellhart breached this duty when she failed to take reasonable care to prevent Jeni and Michael's cash from being lost or stolen. She instructed the agents searching the boxes to search for evidence to support the forfeitures instead of safeguarding the contents of the boxes, created instructions for searching the boxes that were calculated to uncover evidence to support the

forfeitures at the expense of safeguarding the contents, and directly created the frenzied environment that required agents to search the boxes as quickly as possible.

175.   The Doe Defendants also breached this duty when they failed to take reasonable care to prevent Jeni and Michael's cash from being lost or stolen. They failed to take the time to secure the contents against theft or loss, instead processing the box as quickly as they could so they could move on to the next one. The Doe Defendants also failed to create a meaningful inventory of the valuable property inside Jeni and Michael's box. Finally, under the circumstances, the disappearance of the cash can only be explained by the Doe Defendants' failure to take reasonable care to guard the contents of Jeni and Michael's box.

176.   Jeni and Michael's cash was secure in their box before the Doe Defendants broke into it. The mere fact of its disappearance necessarily implies negligence by the Individual Defendants.

177.   As a proximate result of the Individual Defendants' breach of that duty, Jeni and Michael have been damaged in the amount of $2,000.

178.   The tortious conduct by the Individual Defendants also violated the Constitution, including the Fourth Amendment.

179.   As a result of the tortious and unconstitutional conduct of the Individual Defendants, Jeni and Michael have incurred damages in the amount of $2,000.

180.   Individual Defendants' tortious conduct also violated the Constitution and therefore falls under the Westfall Act exception for claims "brought for a violation of the Constitution of the United States." 28 U.S.C. § 2679(b)(2). To the extent the claim remains barred by 28 U.S.C. § 2679(b)(1) under current precedent, Jeni and Michael preserve the issue.

**COUNT IX: Unreasonable Search In Violation Of The Fourth Amendment**
**Against Individual Defendants**
**Under *Bivens*, Westfall Act, Bane Act, and directly under the Fourth**
**Amendment**

181.  Plaintiffs re-allege and incorporate by reference each and every allegation set forth in ¶¶ 1 through 93 above.

182.  The Fourth Amendment protects against unreasonable searches of personal property, including safe-deposit boxes. Warrantless searches are presumptively unreasonable unless a historically recognized exception applies.

183.  The USPV warrant only authorized the search and seizure of USPV's property. It did "not authorize a criminal search or seizure of the contents of the safety deposit boxes." When the Doe Defendants, as ordered by Defendant Zellhart, searched Jeni and Michael's safe-deposit box for forfeitable property and for evidence to support the forfeitures, the search was presumptively unreasonable unless an exception to the warrant requirement applies.

184.  The Individual Defendants sought to justify their search of Jeni and Michael's box (and the other USPV boxes) under the inventory exception to the warrant requirement, but that exception only applies in well-defined situations (like taking custody of an automobile), not seizing locked boxes belonging to hundreds of individuals. The inventory exception is further limited to searches pursuant to standardized policies, while the Individual Defendants searched Jeni and Michael's box pursuant to special supplemental procedures created by Defendant Zellhart solely for the USPV searches.

185.  The inventory exception also does not apply here because the Individual Defendants did not actually conduct an inventory search of Jeni and Michael's box and, on information and belief, did not create a meaningful inventory of the contents. Instead, the Individual Defendants were searching Jeni

and Michael's box for forfeitable property and for evidence to support the forfeiture.

186. To the extent the USPV warrant permitted the Individual Defendants to break into Jeni and Michael's boxes to conduct an inventory, the search was still unreasonable. The warrant expressly stated that it did "not authorize a criminal search or seizure of the contents of the safety deposit boxes," yet the inventory search here was a mere pretext to search Jeni and Michael's box for forfeitable property and evidence to support the forfeitures.

187. To the extent the USPV warrant permitted the Individual Defendants to break into Jeni and Michael's boxes to conduct an inventory, the search was still unreasonable, because the warrant only authorized the inventory searches because Defendant Zellhart misrepresented the true scope of the searches Defendants intended to conduct and failed to disclose the plan to search the boxes for forfeitable property and for evidence to support the forfeitures.

188. It is clearly established, and every reasonable FBI agent has fair warning, that agents may not search safe-deposit boxes without a warrant or an exception to the warrant requirement.

189. It is clearly established, and every reasonable FBI agent has fair warning, that the inventory exception does not permit searches that are a pretext for investigatory searches.

190. It is clearly established, and every reasonable FBI agent has fair warning, that the inventory exception applies to specific situations like taking custody of an automobile or booking people into jail, not to breaking into hundreds of safe-deposit boxes.

191. It is clearly established, and every reasonable FBI agent has fair warning, that the inventory exception applies to searches under standardized procedures, not specialized, one-time procedures created for that specific search.

192.  It is clearly established, and every reasonable FBI agent has fair warning, that searches pursuant to a warrant may not exceed the express limitations of the warrant.

193.  It is clearly established, and every reasonable FBI agent has fair warning, that warrants may not be obtained by misstating the scope of the intended search and omitting material facts about the intended search.

194.  Despite these clearly delineated rights, the Individual Defendants deliberately acted in a manner calculated to deprive Jeni and Michael of their rights.

195.  Jeni and Michael are therefore entitled to damages in the amount of $2,000 for the unreasonable search of their USPV safe-deposit box.

196.  Jeni and Michael are entitled to these damages of $2,000 directly under the Fourth Amendment, which contains clear, prohibitory, enforceable language that binds the government and each of its officers, including the Individual Defendants.

197.  Jeni and Michael are alternatively entitled to damages of $2,000 pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), which provides a cause of action against agents who violate the Fourth Amendment. Additionally, Jeni and Michael have no alternative remedies for their injuries caused by Defendants, and Jeni and Michael's claims do not implicate separation of powers, national security considerations, or any other special factors counseling hesitation against a damages remedy for their injuries.

198.  Jeni and Michael are alternatively entitled to damages of $2,000 pursuant to the Westfall Act, which provides that its bar on actions against federal employees "does not extend or apply to a civil action against an employee of the Government … which is brought for a violation of the Constitution of the United States." 28 U.S.C. § 2679(b)(2)(A).

199.  Jeni and Michael are alternatively entitled to damages of $2,000 pursuant to California's Bane Act, which provides a right of action against any person who "interferes by threat, intimidation, or coercion … with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution … of the United States … ." Cal. Civ. Code § 52.1(b), (c).

**COUNT X: Unreasonable Seizure In Violation Of The Fourth Amendment Against Individual Defendants**

**Under *Bivens*, Westfall Act, Bane Act, and directly under the Fourth Amendment**

200.   Plaintiffs re-allege and incorporate by reference each and every allegation set forth in ¶¶ 1 through 93 above.

201.   The Fourth Amendment protects against unreasonable seizures of personal effects, including cash. Even if the seizure is lawful at its inception, it can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests. And if the original justification for the seizure dissipates, the government must cease the seizure or secure a new justification.

202.   When the Doe Defendants searched and seized the contents of Jeni and Michael's safe-deposit box in accordance with Defendant Zellhart's instructions, they either unreasonably allowed the $2,000 to be stolen or otherwise executed the seizure in an unreasonable manner resulting in the loss of the property.

203.   The Individual Defendants have not returned Jeni and Michael's cash, and the seizure is ongoing. And because the original justification for the seizure has dissipated, the Individual Defendants must secure a new justification for the ongoing seizure. Having stolen, lost, or destroyed the cash is not a valid justification for refusing to return it to Jeni and Michael.

204.   It is clearly established, and every reasonable FBI agent has fair warning, that when seizing personal property like cash, agents may not take the property for their own use or allow others to take the property for their own use.

205.   It is clearly established, and every reasonable FBI agent has fair warning, that when seizing personal property like cash, agents must conduct the seizure in a manner that does not unreasonably infringe possessory interests, including by acting reasonably to ensure the property is not stolen, lost, or destroyed.

206.   It is clearly established, and every reasonable FBI agent has fair warning, that the continuing seizure of personal property like cash requires an ongoing justification, and that having stolen, lost, or destroyed the property is not a valid justification.

207.   Despite these clearly delineated rights, the Individual Defendants deliberately acted in a manner calculated to deprive Jeni and Michael of their rights.

208.   Jeni and Michael are therefore entitled to damages in the amount of $2,000 for the unreasonable manner of the seizure and unjustified continuing seizure of their personal property.

209.   Jeni and Michael are entitled to these damages of $2,000 directly under the Fourth Amendment, which contains clear, prohibitory, enforceable language that binds the government and each of its officers, including the Individual Defendants.

210.   Jeni and Michael are alternatively entitled to damages of $2,000 pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), which provides a cause of action against agents who violate the Fourth Amendment. Additionally, Jeni and Michael have no alternative remedies for their injuries caused by Defendants, and Jeni and Michael's claims do not implicate separation of powers, national security considerations, or any other special factors counseling hesitation against a damages remedy for their injuries.

211.   Jeni and Michael are alternatively entitled to damages of $2,000 pursuant to the Westfall Act, which provides that its bar on actions against federal employees "does not extend or apply to a civil action against an employee of the Government … which is brought for a violation of the Constitution of the United States." 28 U.S.C. § 2679(b)(2)(A).

212.   Jeni and Michael are alternatively entitled to damages of $2,000 pursuant to California's Bane Act, which provides a right of action against any person who "interferes by threat, intimidation, or coercion … with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution … of the United States … ." Cal. Civ. Code § 52.1(b), (c).

**COUNT XI: As-Applied Deprivation of Property Without Due Process Of Law Under the Fifth Amendment Due Process Clause**

213.   Plaintiffs re-allege and incorporate by reference each and every allegation set forth in ¶¶ 1 through 93 above.

214.   The Fifth Amendment Due Process Clause states, "No person shall be … deprived of life, liberty, or property, without due process of law."

215.   Jeni and Michael had property, their $2,000 in cash, stored in their USPV safe-deposit box.

216.   Jeni and Michael have been deprived of that property.

217.   There is no right unless there is also a legal remedy when that right is invaded. If the government stole or lost the property of innocent people and no remedy exists, that violates due process of law.

218.   To the extent the previous counts brought against Defendants in this Complaint are subject to legal defenses (under the FTCA or the Westfall Act's bar on actions against federal employees) that resultingly deprive Jeni and Michael of any remedy, then Jeni and Michael have been deprived of that property without any process of law, let alone "due process of law."

219.   Thus, to the extent those statutes would apply here to permit Jeni and Michael to be deprived of their property without due process of law, those statutes are unconstitutional as applied because they violate Jeni and Michael's right to due process of law, and therefore cannot be invoked to deny Jeni and Michael a remedy.

### REQUEST FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

A.   Award damages in favor of Plaintiffs Jeni Pearsons and Michael Storc and against Defendants United States, Lynne Zellhart, and Doe Defendants 1–5 in the amount of $2,000.

B.   Declare that Plaintiffs Jeni Pearsons and Michael Storc are entitled to a remedy for the government's loss of their $2,000.

C.   To the extent the Court determines that if there is no remedy available for Plaintiffs' injuries under the Constitution, *Bivens*, the Federal Tort Claims Act, the Little Tucker Act, the Bane Act, or the Westfall Act, then declare that the Federal Tort Claims Act and the Westfall Act are unconstitutional as applied here, and that Defendant Zellhart and the Doe Defendants 1 through 5 are liable in damages under California law for their unconstitutional and tortious conduct in violation of Plaintiffs' constitutional rights (conversion, breach of bailment, and negligence).

D.   To the extent the Court determines that the FTCA, Westfall Act, or any other law deprives Plaintiffs of a remedy for the deprivation of their property, declare that those statutes would violate Plaintiffs' rights under the Fifth Amendment Due Process Clause, as applied to the facts of this case, by permitting Plaintiffs to be deprived of their property without due process of law.

E.   Award Plaintiffs attorneys' fees, costs, and expenses under 28 U.S.C. § 2412 and any other applicable provisions of law or equity; and

F.   Award any further legal and equitable relief the Court may deem just and proper.

Dated: September 22, 2023

Respectfully Submitted,

/s/ Lou Egerton-Wiley

**INSTITUTE FOR JUSTICE**
Joseph Gay*
jgay@ij.org
Robert Frommer*
rfrommer@ij.org
901 N. Glebe Rd. Suite 900
Arlington, VA 22203
Tel. (703) 682-9320

Robert E. Johnson*
16781 Chagrin Blvd. Suite 256
rjohnson@ij.org
Shaker Heights, OH 44120
Tel. (703) 682-9320

* Applications for admission
  *pro hac vice* forthcoming.

**THE VORA LAW FIRM, P.C.**
Lou Egerton-Wiley (SBN 323482)
lou@voralaw.com
Nilay U. Vora (SBN 268339)
nvora@voralaw.com
Jeffrey Atteberry (SBN 266728)
jatteberry@voralaw.com
201 Santa Monica Blvd., Ste. 300
Santa Monica, California 90401
Tel. (424) 258-5190

*Attorneys for Plaintiffs*

COMPLAINT